UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMI FUQUA,<br><br>            Plaintiff,<br><br>      v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>            Defendant. | Case No. 16-cv-01193-JCS<br><br>**FURTHER ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 33, 77 |

## I.    INTRODUCTION

Plaintiff Tammi Fuqua brings this action alleging disability discrimination and wrongful termination under California's Fair Employment and Housing Act ("FEHA") and California common law, as well as a claim for failure to pay wages under the California Labor Code. Defendant United Parcel Service, Inc. ("UPS") moved for summary judgment as to all of Fuqua's claims. The Court held a hearing on August 18, 2017, and issued a brief order on September 26, 2017 (dkt. 77) granting UPS's motion as to Fuqua's fourth and eighth claims (respectively, for disability discrimination based on a theory of disparate impact and for violation of section 201 of the California Labor Code) and her prayer for punitive damages, but denying the motion as to all other claims.[1] This order explains the reasoning of that disposition.

## II.    BACKGROUND

### A.    Factual Record

#### 1.    Injury and Aftermath in October of 2013

Fuqua began working for UPS in 2005, and was a part-time night supervisor at UPS's Richmond, California hub facility in 2013, typically working shifts from 10:00 PM to 3:30 AM.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Fuqua Decl. (dkt. 52) ¶¶ 1–2; Murphy Decl. (dkt. 35) ¶ 3.

Early in the morning of October 3, 2013, Fuqua's right ankle buckled and gave out. Fuqua Decl. ¶ 3. Fuqua told her direct supervisor, Rene'a Rismay, about the injury at the end of her shift, around 3:30 AM. Fuqua Decl. ¶ 3; Rismay Decl. (dkt. 36) ¶ 3. Fuqua was in pain, and states in her declaration that she told Rismay she would rest her ankle to see if it recovered. Fuqua Decl. ¶ 3. Rismay states that she asked Fuqua if she was okay, and that Fuqua told her she was okay. Rismay Decl. ¶ 3. At some point that morning, acting manager Mario Lee learned from safety supervisor Sal Omran that Fuqua had hurt her ankle, and Lee asked if she was okay. Lee Decl. (dkt. 37) ¶ 3. According to Lee, Fuqua "said she was fine." Lee Decl. ¶ 3. Lee and Rismay therefore determined that it was not necessary to follow the procedure for a workplace injury. Rismay Decl. ¶ 3; Lee Decl. ¶ 3. According to Lee, Fuqua was trained on and should have known about the injured employee process. Lee Decl. ¶ 3. Lee nevertheless called health and safety supervisor Grace Mangaoang to advise her of Fuqua's injury and ask her to follow up with Fuqua. *Id.* ¶ 4.[2]

Fuqua states that she asked a supervisor for a ride to her car because she was still in pain and had difficulty putting weight on her ankle when she left the UPS facility, but the supervisor declined to drive her to her car. Fuqua Decl. ¶ 4. Instead, a security guard helped her by pushing her on a chair to her car. *Id.* Fuqua had difficulty driving home because of her injury, and continued to experience pain. *Id.*

David Comer, the UPS hub manager, was out of the office for the first week of October, and acting manager Mario Lee called him on October 3 or 4,[3] 2013 to advise him that Fuqua injured her ankle at work. Comer Decl. (dkt. 34) ¶ 3; Lee Decl. ¶ 5. Comer passed the news of Fuqua's injury to Mangaoang. Comer Decl. ¶ 3.

---

[2] Lee's declaration is not entirely clear on this point, but his call to Mangaoang might have been prompted by another supervisor telling him that Fuqua's injury was more severe than he had previously realized. *See* Lee Decl. ¶¶ 3–4.
[3] Lee states that he called Comer "either on October 3, or October 4, 2013." Lee Decl. ¶ 5. Comer states that he learned of the injury from Lee "on or about October 4, 2013." Comer Decl. ¶ 3. Mangaoang states that Comer called her about the injury "[o]n or about October 3, 2013." Mangaoang Decl. ¶ 6.

Mangaoang called Fuqua to ask about her injury and whether she needed medical attention, and Fuqua said she did. Mangaoang Decl. (dkt. 38) ¶ 7. Mangaoang generally authorizes employees at UPS's Richmond facility to receive treatment at the Concentra medical office in Richmond. *Id.* ¶ 4. An employee who is injured when Concentra is not open can be treated at the Kaiser emergency room in Richmond with authorization from a manager, but would then be expected to visit Concentra the next day for further treatment and a work status report. *Id.* Mangaoang asked Fuqua to go to Concentra for treatment, but Fuqua said she could not drive because of her injury and did not have a ride to get there before 3:30 PM, which Mangaoang said would be too late for her to be seen there. *Id.* ¶ 7; Fuqua Decl. ¶ 5. Mangaoang told Fuqua that she would not drive her to Concentra in Richmond, and that Fuqua could not go to the Concentra location in Fairfield, where Fuqua lives. Fuqua Decl. ¶ 5. Fuqua was able to get a ride at around 4:00 PM and arrived at the Kaiser emergency room in Vacaville around 5:00 PM, where she was give x-rays, medication, crutches, and a note placing her off work on October 3 and 4, 2013. *Id.* ¶ 4 & Ex. A. Fuqua called Mangaoang, who said that UPS would not honor the note from Kaiser and that Fuqua needed to go to Concentra the next day. *Id.* ¶ 7; Mangaoang Decl. ¶ 7. Mangaoang also told Fuqua to come in for her shift that evening to complete paperwork related to her injury, but that she would not need to stay long. Fuqua Decl. ¶ 7.

Fuqua's sister drove her to UPS the evening of October 3, 2013, and waited in the car with Fuqua's young daughter because Fuqua did not believe she would be there long. *Id.* ¶ 8. At the beginning of her shift, Fuqua gave Rismay, Lee, and Mangaoang the status report from Kaiser stating that she sprained her ankle and could not work that day or the next day. *Id.*; Rismay Decl. ¶ 4. Fuqua states that Mangaoang and Rismay "questioned [her] at length" in a small room, "trying to put words in [her] mouth." Fuqua Decl. ¶ 8. According to Fuqua, Lee and Mangaoang said that they would not honor the report because it was not from Concentra, and instead told Fuqua that she "had to stay [her] entire shift and assigned programs for [her] to complete on a computer." *Id.* Rismay states in her declaration that she instructed Fuqua to complete a computer-based training course and workplace injury paperwork, but "did not tell [her] to do any other task or to complete her entire shift." Rismay Decl. ¶ 4. Fuqua asked to leave early because her child

was waiting for her in the car, and Rismay states that she told Fuqua that she could go if she needed to. *Id.* According to Fuqua, Lee told her that she would "receive an infraction if [she] left before the end of [her] shift." Fuqua Decl. ¶ 8. Lee states in his declaration that he told Fuqua she could leave, but said that leaving without completing the paperwork and computerized training might be considered an infraction, although he did not in fact cite Fuqua for an infraction. Lee Decl. ¶ 6. Lee also told Fuqua that she needed to be at work for her next shift—according to his declaration, to complete the workplace injury process, but according to Fuqua's declaration, he said she needed to work a full shift. *Id.*; Fuqua Decl. ¶ 8.[4]

Fuqua was not paid for her October 3, 2013 shift. Fuqua Decl. ¶ 8. As a salaried employee, Fuqua was generally paid regardless of whether she worked a full shift, and would be paid even if sent home early by a supervisor, but she was required to enter her hours (or a code for a vacation day or sick day) in a tracking system, and would not be paid if she failed to enter any hours or code for a given day. Murphy Decl. ¶ 3; Rismay Decl. ¶ 6. Fuqua did not enter any hours or non-work code for October 3, 2013. Murphy Decl. ¶ 3 & Ex. A.

Fuqua visited Concentra on October 4, 2013, and met Mangaoang in the lobby. Fuqua Decl. ¶ 9; Mangaoang Decl. ¶ 9. According to Fuqua, "Mangaoang attempted to go inside the examination room with [her]," but Fuqua said she did not want her to. Fuqua Decl. ¶ 9. Mangaoang states that she remained in the waiting room until Fuqua's examination was completed. Mangaoang Decl. ¶ 9. According to Mangaoang, she usually accompanies employees to Concentra and authorizes treatment, but she states that she has "never accompanies an employee into the examination room at Concentra because doing so would violate HIPAA rules." *Id.* ¶ 4. Physician's assistant Melodie Venturi examined Fuqua and provided Mangaoang with a work status report indicating that Fuqua could return to work, but that she was restricted to seated work and could not drive. *Id.* ¶ 9; Fuqua Decl. ¶ 9.

---

[4] According to Mangaoang, UPS's policy generally calls for an injured employee to complete the required paperwork and training within twenty-four hours, which is "important for purposes of OSHA record keeping." Mangaoang Decl. ¶ 3. The paperwork "reflects how the injury occurred and lists items to be completed relating to safety training," and the computerized training, which is specific to the type of injury sustained, takes about ten minutes to complete for a slip-and-fall injury or ten to fifteen minutes for a "push and pull." *Id.*

4

United States District Court
Northern District of California

The evening of October 4, Fuqua asked for a discretionary day off, but Lee denied the request because Fuqua did not give sufficient advance notice, telling her that she would receive an infraction if she did not show up. Fuqua Decl. ¶ 10; Lee Decl. ¶ 6. Fuqua states in her declaration that she was in pain, drowsy due to medication, and unable to find transportation due to medical orders not to drive, but it is not clear if she told any of that to Lee. Fuqua Decl. ¶ 10. Fuqua did not come to work for that shift. *Id.*; Lee Decl. ¶ 6.

Comer, the hub manager, returned to work on Monday, October 7, 2013 and met with Fuqua that day to advise her that while she was restricted by her ankle injury, she would work with safety supervisor Sal Omran in an office.[5] Comer Decl. ¶ 4. According to Fuqua, Comer told her, "in a sarcastic voice, that he had heard [she] was trying to come up with every excuse not to show up to work." Fuqua Decl. ¶ 11. Comer also asked Fuqua to complete the computerized training course and to write a statement of how the injury occurred, which was Comer's standard practice for workplace injuries, and Fuqua did not object. Comer Decl. ¶ 4. Comer, Rismay, and human resources representative Snoviaer "Snow" Murphy repeatedly questioned Fuqua about her injury that day, and another employee told her that Lee had said in a staff meeting on October 4 that Fuqua was lying about her injury. Fuqua Decl. ¶ 11.

When Fuqua had not completed the training or submitted a written statement later that week, Comer and Murphy met with Fuqua to discuss her injury. Comer Decl. ¶ 4; Murphy Decl. ¶ 4. According to Murphy, Fuqua said that she hurt her ankle on grating in the UPS facility, but declined to elaborate further, stating that she did not want to answer questions including whether she had been on the grating or on a chute before she fell. Murphy Decl. ¶ 4. Comer and Murphy again asked Fuqua to write a statement explaining how she hurt herself, and Fuqua agreed to do so. *Id.*; Comer Decl. 4. According to Fuqua, Comer told her that he did not believe the injury happened the way she had reported it. Fuqua Decl. ¶ 12. Comer sent Fuqua home early from her shifts on October 15 and 16, 2013 because she had not yet provided a written statement, and told

---

[5] Fuqua thereafter continued to be assigned office duties, generally with Omran. Rismay Decl. ¶ 5.

her not to return until the statement was complete. Fuqua Decl. ¶¶ 13–14 & Ex. B.[6] Fuqua "eventually submitted the statement." Comer Decl. ¶ 4; *see also* Mangaoang Decl. ¶ 11 & Ex. A ("Injury Prevention Report" completed by Fuqua, dated October 15, 2013).

## 2. Subsequent Medical Treatment and UPS Actions

Fuqua continued to receive treatment from Melodie Venturi at Concentra from October 4, 2013 through December 20, 2013, and received a series of work status reports that she passed on to UPS imposing restrictions on her work. Fuqua Decl. ¶ 15. In November of 2013, Venturi told Fuqua that she would seek approval for Fuqua to see a podiatrist, and on December 20, 2013 Venturi informed Fuqua that she was transferring Fuqua to Dr. Jonathan Steinberg, D.P.M., for further treatment. *Id.* ¶ 16. Venturi testified at her deposition that after a referral to a specialist is approved, there is a transfer of care, and Venturi does not see the patient again. Velez Decl. Ex. B (Venturi Dep.) at 42:14–43:15. She also testified that she transferred Fuqua's care after the December 20 visit, and that the report provided after that visit indicated that her care was transferred and that she did not have another appointment scheduled with Concentra. *Id.* at 48:16–49:25. Fuqua visited Dr. Steinberg on December 30, 2013 and received a cortisone shot and a work status report with restrictions including no climbing, which she states she passed along to UPS. Fuqua Decl. ¶ 17 & Ex. D. Fuqua saw Dr. Steinberg again on January 10, 2014 and received a status report reflecting the same restrictions, which she again provided to UPS. *Id.* ¶ 18 & Ex. E.

On January 16, 2014, Fuqua learned for the first time that an appointment had been scheduled for her at Concentra for that day. *Id.* ¶ 19. She was surprised that she had an appointment with Concentra because Venturi had transferred her care to Dr. Steinberg and told her that she would not return to Concentra for her ankle injury. *Id.* Fuqua asked Concentra to

---

[6] Rismay states that she does not recall Comer ever sending Fuqua home early and, as Fuqua's direct supervisor, would have been informed if that happened (Rismay Decl. ¶ 6), but Fuqua's time records show that she only worked 1.55 hours on October 15 and 0.18 hours on October 16 (Fuqua Decl. Ex. B; Murphy Decl. Ex. A). Comer's declaration is silent on the subject. There is no indication, however, that Fuqua received less pay for her shortened shifts on those days. *See* Rismay Decl. ¶ 6 ("[I]f she had been sent home early by any supervisor or manager, she would get paid for her entire shift because she is a salaried employee.").

1    reschedule that appointment, and Concentra rescheduled it for January 27, 2014. *Id.*

2         Murphy and Comer met with Fuqua on or about January 20, 2014 because UPS

3    purportedly did not have a current work status report for her. Murphy Decl. ¶ 6. According to

4    Murphy, Fuqua said that she did not have a current report because she missed her last doctor's

5    appointment. *Id.* Murphy suggested that Fuqua be sent home because UPS lacked current

6    information regarding her ability to work; Comer agreed and sent Fuqua home less than half an

7    hour into her shift. *Id.*; Fuqua Decl. ¶ 20 & Ex. F. According to Fuqua, Comer asked her why she

8    did not attend the January 16 Concentra appointment, and when she told him she rescheduled it to

9    January 27 because she did not have advance notice of the appointment, he told her she should not

10   return to work until she rescheduled it again for an earlier date. Fuqua Decl. ¶ 20. Fuqua did not

11   appear for work on January 21, 2014 because of that instruction, but came to work on January 22

12   after receiving from a text message from Comer instructing her to do so. *Id.* ¶¶ 20–21. When

13   Fuqua arrived on January 22, she was informed that she could no longer use a parking space close

14   to the UPS facility, as she had been doing since her injury. *Id.* ¶ 22. Also on January 22, 2014,

15   Mangaoang learned from a UPS occupational health nurse that Fuqua had rescheduled her

16   Concentra appointment. Mangaoang Decl. ¶ 12 & Ex. B.

17        At the rescheduled Concentra appointment on January 27, 2014, Venturi approved Fuqua

18   for regular work duties effective the same day. *Id.* ¶ 13 & Ex. C (Work Status Report). The

19   "remarks" section of the report approving Fuqua for regular work reads "TRIAL," with no further

20   explanation. *Id.* Ex. C.

21        Fuqua returned to work the same day, but told Mangaoang that Dr. Steinberg had imposed

22   restrictions on the work she could do, including that she could not climb ladders. *Id.* ¶ 3; Fuqua

23   Decl. ¶ 24. Fuqua also informed Rismay that she could not climb ladders. Fuqua Decl. ¶ 24;

24   Rismay Decl. ¶ 7. Fuqua states that despite Dr. Steinberg's restrictions, Mangaoang "instructed

25   [her] to perform [her] job, including climbing ladders," and Fuqua complied with that order by

26   climbing ladders even though it exacerbated her ankle pain. Fuqua Decl. ¶ 24. Mangaoang states

27   that she told Fuqua to "just do what she could do," but to go back to Concentra the next day for a

28   new work status report reflecting her restrictions. Mangaoang Decl. ¶ 13.

Rismay states that she asked another part-time supervisor to climb ladders for Fuqua as necessary, who agreed to do so, and that she did not tell Fuqua to climb ladders after that, did not observe Fuqua climbing ladders, and instead observed the other part-time manager climbing ladders for her. Rismay Decl. ¶ 7. According to Rismay, Fuqua also could have asked the employees who reported to her to climb ladders if she needed help. *Id.* ¶ 8. Rismay was not aware of Dr. Steinberg and only saw Fuqua's work status reports from Concentra. *Id.* ¶ 9. According to Fuqua, however, neither Rismay nor anyone else at UPS told her that another employee could climb ladders for her if she was unable to do so. Fuqua Decl. ¶ 24.

Rather than returning to Concentra the next day (January 28, 2014), Fuqua returned to Dr. Steinberg, who gave her another report with similar restrictions, including no climbing, which Fuqua gave to Mangaoang later that day. *Id.* ¶ 25; Mangaoang Decl. ¶ 14 & Ex. D.[7] According to Dr. Steinberg, Fuqua could work a 5.5-hour day, half sitting and half standing or walking, with rest as needed and no climbing ladders. Mangaoang Decl. Ex. D. Mangaoang, who was not familiar with Dr. Steinberg, asked Fuqua if he was her treating physician, but Fuqua "was unable to answer." *Id.* ¶ 14. Mangaoang told Murphy about the conflicting reports from Concentra and Dr. Steinberg. Murphy Decl. ¶ 7. Murphy suggested that Mangaoang contact the risk management department or occupation health department for advice. *Id.*; Mangaoang Decl. ¶ 14. In the meantime, approximately one hour into her January 28, 2014 shift, Fuqua was sent home because UPS "did not know how to work her." Mangaoang Decl. ¶ 14; *see* Fuqua Decl. ¶ 26 & Ex. F.

Mangaoang emailed UPS employees in the risk management and occupational health departments on January 29, 2014, and one of them sent the inquiry to UPS's insurance adjuster at Liberty Mutual. Mangaoang Decl. ¶ 14 & Ex. B. The adjuster responded that she reached out to Dr. Steinberg and he told her that he was not Fuqua's primary provider, he did not want to take over her care, and Concentra was still her primary provider. *Id.* The adjuster therefore instructed

---

[7] Fuqua's declaration states that Exhibit G thereto is a copy of the report Dr. Steinberg provided on January 28, 2014, but that exhibit is in fact a second copy of his January 10, 2014 report, which also appears as Exhibit E to Fuqua's declaration. Dr. Steinberg's January 28, 2014 report appears in the record as Exhibit D to Mangaoang's declaration.

UPS to use the Concentra report returning Fuqua to normal duties.  *Id.*  Also on January 29,

Liberty Mutual sent Fuqua a letter stating that "Dr. Steinberg has advised he is not taking over as

primary treating physician and will remain consulting physician," that "an appointment with

Concentra has been schedule for Tuesday, February 4th at 4pm," and that Fuqua should "be sure

to attend this appointment."  Fuqua Decl. ¶¶ 27, 32 & Exs. H, L.  It is not clear from the record

whether Fuqua did so.

Comer states in his declaration that he periodically asked supervisors working under him to

sign off on the essential job functions of their positions, and that he asked Fuqua and all other part-

time supervisors to sign off on a list of essential functions for that position on January 31, 2014.

Comer Decl. ¶ 6 & Ex. A; Lee Decl. ¶ 7.  Fuqua did not meet the February 3, 2014 deadline to

return her signed form, and Comer and Lee met with her about the form that day.  Lee Decl. ¶ 7.

Fuqua states that she had never been asked to sign such a form before February 3, 2014, and that

she did not sign it because she was "unable to perform all of [her] job duties at the time due to

[her] right ankle condition."  Fuqua Decl. ¶ 28 & Ex. I.  According to Lee, Fuqua said that UPS

was not honoring her doctor's note requiring modified duties, but when Lee and Comer asked

what restrictions were not being honored, Fuqua had no answer.  Lee Decl. ¶ 7.  Fuqua refused to

sign the form even though Lee told her that "she was simply confirming the essential functions of

her job and that she can write on the form the functions she cannot perform due to her

restrictions."  *Id.*  Fuqua believed that the form required her to confirm her ability to perform all of

the functions listed and that she could not do so without having "somebody to look at [the] form"

because she is not a doctor.  Kumagai Decl. (dkt. 41) Ex. A (Fuqua Dep.) 169:12–21.  Lee then

asked Fuqua to instead write "her understanding of what was being asked of her and what

restrictions were not being honored."  Lee Decl. ¶ 7.

Fuqua states that Comer asked her to "write [her]self up" for not signing the essential

functions form.  Fuqua Decl. ¶¶ 28–29.  Instead, Fuqua wrote the following statement

documenting what she viewed as mistreatment:

> To Corporate, HR, David [Comer] and Whom Ever It May Concern
>
> Due to being under doctor care I (Tammi Fuqua) have continuously

been harassed. I have been threatened to perform regular duties after the doctor modified my duties. I am currently under doctor care. Nevertheless, the doctor notes aren't honored. As a result, I had to get legal counsel. The essential functions of my job may vary according to the pain and the harassment I face on a daily basis. This harassment is very stressful. I feel sick to my stomach and sad. My manager David Comer said I am wasting his time when I asked for corporate phone number. David Comer told me he did not have corporate phone number, go to the top of hill (HR) to get the number. I am treated unfair.

I was called to David Comer office Monday February 3, 2014 regarding Essential Job Functions form, I am under doctor care and need to consult with legal counsel.

*Id.* ¶ 29 & Ex. J (sic throughout). Fuqua gave that statement to Mangaoang, who told her to

rewrite it because it was not what Comer requested. *Id.* ¶ 29; Kumagai Decl. Ex. A (Fuqua Dep.)

169:7–11.

On February 4, 2014, Comer and Murphy asked Fuqua to write a list of the harassing

conduct she had experienced, and Fuqua wrote the following:

To Corporate, HR, Dave and Whom Ever It May Concern,

I Tammi Fuqua was instructed to write down a list or I will be sent home again without pay.

Here is a list that Dave and Snow [Murphy] (HR) told me to put together

Doctor notes weren't honored.

I was seen at the doctor office.

Instructed to climb the ladder because doctor note wasn't honored.

Not honored: Standing, sitting, walking as doctor recommended

UPS emails to the doctors

Fuqua Decl. ¶ 30 & Ex. K.

Lee wrote a report to Comer on February 7, 2014 memorializing the February 3 meeting

with Fuqua:

On Monday February 3, 2014, a meeting was held with Tammi Fuqua (p/t Supervisor), myself Mario Lee, and Manager Dave Comer. Discussed in the meeting was Tammi's failure and refusal to turn in a form issued to her and all the other part time Supervisors on Friday January 31 2014. The Form was to be reviewed, signed, and returned, on the third of February.

> Tammi stated in this meeting that she was advised not to sign and turn in this form by her attorney. Tammi also stated that she felt we were not honoring her doctor note, when asked for specific incidents and facts she could not remember them. Tammi stated she needed Dave Comer to call her attorney she was told that he would not be contacting her attorney. Tammi state she did not want to sign the form because she was on modified duty, she was told she can write that on the form.
>
> Upon conclusion of this meeting Tammi was asked to do a write up explaining her understanding of the meeting that she failed to submit to her manager a task that was given and what specific things were not being honored in her doctor note. Tammi left the office to start the write up and upon conclusion of her write had failed to list in it the things from the meeting and how her work modifications were not being honored, she also for the second time failed to turn in the form.

Lee Decl. ¶ 7 & Ex. A (sic throughout; paragraph breaks added for ease of reading).

In "early February 2014," Fuqua received a second letter from Liberty Mutual dated February 5, 2014 and stating as follows:

> Please note that your treating physician Dr. Venturi [sic[8]] has transferred your care to a podiatry specialist, Dr. Meskin. In order to ensure current medical status, you have been scheduled for an appointment on Tuesday, 2/11/14 at 10:45am. The location is listed below.
>
> Please be sure to attend this appointment.
> Your employer has been notified of the appointment time & date, as well.

Fuqua Decl. ¶ 33 & Ex. M. Fuqua never saw Dr. Meskin. *Id.* ¶ 33.

### 3. Leave of Absence

Fuqua was evaluated at Kaiser for "stress related issues" caused by her work experiences since her ankle injury, and began a leave of absence from UPS on February 6, 2014. *Id.* ¶ 34. During that time, she applied for short-term disability benefits from Aetna, the claim administrator for UPS's short-term disability plan, based on stress and anxiety. Kumagai Decl. Ex. A (Fuqua Dep.) 671:10–672:16 & Ex. 74. She continued to receive treatment at Kaiser through October of 2014 from Dr. Harry Brown, Ph.D., a psychologist. Fuqua Decl. ¶ 35

Fuqua saw Dr. Steinberg again for her ankle injury on July 7, 2014, and he gave her a work

---

[8] Venturi is a physician's assistant.

status report limiting her to 5.5 hours of work per day, half standing or walking and half sitting, with rest as needed and no climbing ladders. *Id.* ¶ 36 & Ex. N. Fuqua provided that report to UPS. *Id.* ¶ 36.

On August 6, 2014, Fuqua saw Dr. Brown and he approved her for modified work of four hours per day, not exceeding twenty hours per week. *Id.* ¶ 37 & Ex. O. Fuqua provided Dr. Brown's work status report to UPS. *Id.* ¶ 37.[9]

### 4. Return to Work Site in August of 2014 and Subsequent Events

On August 7, 2014, Fuqua showed up at UPS's Oakland hub facility in an effort to return to work, and gave the most recent reports from Drs. Brown and Steinberg to Comer. *Id.* ¶ 38. Mangaoang, who was aware that Fuqua had not been at work for some time but did not know why, asked to talk to her, and Fuqua gave her the July 7, 2014 note from Dr. Steinberg reflecting the same restrictions he had assessed in January. *Id.*; Mangaoang Decl. ¶ 15. Mangaoang told Fuqua that she was surprised to see her back without notice and that she would need to check with the risk management department about how to proceed. Mangaoang Decl. ¶ 15. Comer also had no notice that Fuqua would be returning to work, and states in his declaration that failure to give notice before returning from injury leave was contrary to UPS's standard procedure. Comer Decl. ¶ 7. Comer and Mangaoang agreed that Fuqua should not work that day because they had not yet gotten a report from the risk management department. *Id.*; Mangaoang Decl. ¶ 16. Mangaoang told Fuqua "that [she] could not return to work at UPS until [she] was 100 percent healthy," and walked her out of the building. Fuqua Decl. ¶ 38.

Later in August, Fuqua began seeing a different podiatrist—Dr. Ryan Thomas, D.P.M.— for her ankle injury, and has continued to receive treatment from him through the present. *Id.* ¶ 39; *see also* Kumagai Decl. Ex. E (Thomas Dep.) 10:7–16.

On August 25, 2014, Mangaoang received an email notification that Fuqua would be

---

[9] Later, on August 27, 2014, Dr. Brown completed a form for Aetna on which he checked a box stating that his findings would prohibit Fuqua from performing "Any Reasonable Occupation," but later in the same form stated that Fuqua could work with modifications—specifically, that she could work up to four hours per day, not to exceed twenty hours per week. Kumagai Decl. Ex. D (Brown Dep.) 70:10–71:9 & Ex. D.

12

returning to work on September 1, 2014. Mangaoang Decl. ¶ 17 & Ex. E. The notification stated that Fuqua's leave had begun on August 21, 2014, and was due to "My Own Medical Condition." *Id.* Ex. E. Mangaoang forwarded the notification to Loretta Calderon in the risk management department for clarification, and in response to questions from Calderon, Mangaoang wrote that when Fuqua "came in 8/7 with the same restrictions (no climbing ladders…..)," "still limping around," Mangaoang had "told her that she had to come back without restrictions." *Id.* ¶ 17 & Ex. E. This is consistent with Fuqua's statement that Mangaoang told her she must be "100 percent healthy" to return. *See* Fuqua Decl. ¶ 38. According to Mangaoang, her email to Calderon was not "a complete and full version of what was said to Ms. Fuqua on August 7," and Mangaoang is "unaware of any policy at UPS that requires an employee to be 100% healthy in order to return to work." Mangaoang Decl. ¶ 17. According to UPS nurse supervisor Haidee Lagunday, UPS has no such policy. Lagunday Decl. (dkt. 40) ¶ 18. Mangaoang's declaration does not, however, deny that she told Fuqua that she needed to have no restrictions before she returned to work. Mangaoang Decl. ¶ 17.

UPS policy recognizes various forms of medical leave, but regardless of the form that an employee's leave takes, UPS policy calls for administrative termination of any employee who remains on leave longer than twelve months, unless a request for accommodation (which can include additional finite leave) is pending or an accommodation is granted. Lagunday Decl. ¶ 3 & Ex. A (Summary Plan Description, stating, "Except as limited below, if you are absent from your regular occupation for 12 months, you will be administratively separated from employment, regardless of your status on [short term or long term disability]"). UPS sends employees who are on leave a "9-month letter" reminding them of the twelve-month termination rule and the process for requesting accommodations. *Id.* ¶ 3. Once an employee starts the process, UPS sends the employee an "ADA packet" (a term referencing the federal Americans with Disabilities Act) that includes, among other things, instructions for completing medical forms and an "Authorization for Release of Medical Information." *Id.* ¶ 4.

By September of 2014, Dr. Thomas had provided Fuqua with return-to-work notifications calling for use of a walking boot brace, restricting the extent that she should walk at work, and

13

1   stating that she should not climb ladders or stairs.  Kumagai Decl. Ex. E (Thomas Dep.) 24:12–

2   25:17.  Dr. Thomas did not discuss surgery with Fuqua because he determined that, as a self-

3   paying patient, the cost would be prohibitive.  *Id.* 36:10–20.

4         UPS sent Fuqua a nine-month letter on October 24, 2014, stating that she had been unable

5   to perform the essential functions of her job since February 6, 2014 and informing her of both the

6   possibility of requesting an accommodation and the policy providing for termination after twelve

7   months of leave.  Lagunday Decl. ¶ 5 & Ex. B; Fuqua Decl. ¶ 41 & Ex. P.  This was the first

8   contact that Fuqua received from UPS regarding the potential for a reasonable accommodation of

9   her restrictions since she visited the Oakland hub on August 7, more than two months earlier.

10   Fuqua Decl. ¶ 40.

11         In the meantime, Fuqua applied for state disability benefits.  Kumagai Decl. Ex. A (Fuqua

12   Dep.) 300:8–18.  Dr. Thomas completed a form dated November 3, 2014 stating that Fuqua was

13   unable to work due to her injury and would remain disabled for about one year.  Kumagai Decl.

14   Ex. E (Thomas Dep.) 136:2–138:21 & Ex. 21.[10]  Fuqua's application was approved and she

15   received disability benefits from the state of California for a period of one year.  Kumagai Decl.

16   Ex. A (Fuqua Dep.) 303:6–17.  The notifications accompanying Fuqua's state disability payments

17   stated that by accepting payment, Fuqua certified that she was unemployed and disabled during

18   the full period corresponding to the payment.  *Id.* 682:4–22 & Ex. 76.

19         Fuqua contacted the UPS Human Resources Service Center (the "UPS HRSC") by

20   telephone on November 19, 2014 and requested that an ADA accommodations request packet be

21   sent to her home address in Fairfield, California.  Fuqua Decl. ¶ 42.  The UPS HRSC sent a packet

22   the same day, but to an address in Vallejo, not the Fairfield address that UPS had on file for

23   Fuqua.  Lagunday Decl. ¶ 5.

24         The packet identified UPS nurse supervisor Brenda Hellerud as the person to whom Fuqua

25   should send the completed forms, and according to Haidee Lagunday (another UPS nurse

26

27   ――――――――――――
[10] The following year, in November of 2015, Dr. Thomas wrote a letter in support of an appeal of

28   that application stating that Fuqua was still unable to work due to her ankle injury.  Kumagai Decl.
Ex. E (Thomas Dep.) 105:2–16 & Ex. 18.

supervisor), the packet included an authorization for release of information. *Id.* ¶ 5 & Ex. C. The cover letter to the packet stated that if Fuqua "fail[ed] to return the forms within four weeks . . . UPS w[ould] consider [Fuqua] to have withdrawn [her] request." *Id.* ¶ 6 & Ex. C. According to Lagunday, Hellerud sent a follow up letter to Fuqua on December 3, 2014 stating that UPS had not received her forms, could not proceed without them, and would consider Fuqua to have withdrawn her request if the forms were not received by December 17, 2014. *Id.* ¶ 7 & Ex. D. That letter included a telephone number for Fuqua to contact Hellerud if Fuqua was "having difficulty securing the requested medical information or need[ed] other assistance with this process." *Id.* Ex. D. It is not clear what address UPS used for the December 3 letter.

UPS received a fax addressed to Hellerud on December 5, 2014 from the office of Dr. Paul D. Weiner, D.P.M., with an attached progress note electronically signed by Dr. Weiner discussing Fuqua's chronic ankle pain and assessing "[r]ight TN arthritis," "[r]ight plantar fasciitis," "[c]hronic pain issues to right ankle/foot," and "[p]ossible lumbar radiculopathy." *Id.* ¶ 8 & Ex. E. Although the note was electronically signed by Dr. Weiner, it reflected that Dr. Thomas—the podiatrist Fuqua had been seeing since August—was the doctor who had seen Fuqua. *Id.* Ex. E. The cover letter to the note indicated that it was sent at Fuqua's request. *Id.* UPS acknowledged receipt of that note on December 17, 2014, but told Fuqua that it still needed her medical forms from the ADA packet and could not process her accommodation request without them, and that she should contact the UPS HRSC with any questions. *Id.* ¶ 9 & Ex. F. Once again, it is not clear what address UPS used for this acknowledgment letter to Fuqua.

Fuqua states that she "had not received any paperwork from UPS HRSC related to [her] request for a reasonable accommodation" as of December 29, 2014, and that she called the UPS HRSC that day to request that it be resent. Fuqua Decl. ¶ 42; *see* Lagunday Decl. ¶ 10. UPS sent her another ADA packet that day, this time to her Fairfield address, which—according to Lagunday—contained the same documents as the first. Lagunday Decl. ¶ 10 & Ex. H.[11] Fuqua

---

[11] Lagunday states in her declaration that Exhibit H is a "true and correct copy of the December 29, 2014 ADA packet sent to Ms. Fuqua," Lagunday Decl. ¶ 10, but that exhibit actually consists of only a one-page cover letter, *id.* Ex. H.

received a packet in early January, but states that it included only a "Request for Medical Information form and an essential job functions form," and did not include the Authorization for Release of Health Information form.  Fuqua Decl. ¶ 44 & Ex. Q.[12]

According to Lagunday, UPS sent Fuqua a letter on January 12, 2015 stating that it had not received any communication from her since sending the December 29, 2014 ADA packet, that UPS could not evaluate her request for an accommodation if she did not submit the forms from the packet, and that UPS would consider the request withdrawn if it did not receive the forms by January 26, 2015.  Lagunday Decl. ¶ 11 & Ex. I.  The letter also advised Fuqua to call the UPS HRSC if she had difficulty obtaining the forms or needed assistance.  *Id.* Ex. I.  Fuqua states that she did not receive that letter.  Fuqua Decl. ¶ 47.

Fuqua gave the Request for Medical Information form that she received on December 29 to Dr. Thomas, received it back from his office on January 14, 2015, and submitted it to UPS by fax.  *Id.* ¶ 45 & Ex. R.  Dr. Thomas wrote that conditions affecting Fuqua's ankle and foot rendered her unable to climb stairs or ladders, unable to stand or walk for more than half of the workday, in need of frequent rest, and unable to lift items heavier than forty pounds, although she could lift ten-pound objects "frequently."  *Id.* Ex. R.  Fuqua again faxed the form to UPS on January 28, 2015.  *Id.* ¶ 46 & Ex. S; Lagunday Decl. ¶ 13 & Ex. L.

On January 30, 2015, Fuqua received a letter that UPS sent on January 26 stating that it had not received any communication from Fuqua or her doctors since UPS sent the January 12 letter, and that UPS therefore considered Fuqua's request for an accommodation withdrawn and was "discontinuing processing [her] request at [that] time."  Fuqua Decl. ¶ 47 & Ex. T; Lagunday Decl. ¶ 12 & Ex. L.

UPS sent a letter on January 29, 2015, which Fuqua received soon thereafter, stating that UPS had received the form she sent on January 28 but that the medical information form was "insufficient" without a completed Authorization for Release of Health Information form, and that UPS "cannot process [Fuqua's] request further until the requested information is received."

---

[12] The exhibit to Fuqua's declaration, like Lagunday's, includes only the December 29, 2014 cover letter, without any attachments.

Lagunday Decl. ¶ 14 & Ex. M; Fuqua Decl. ¶ 47 & Ex. T.  The letter did not include a copy of the

release form.  Fuqua Decl. ¶ 47.  On January 31, 2015, Fuqua send another fax to Hellerud with

another copy of the Request for Medical Information form, and the following cover letter:

> Dear Brenda Hellerud/Human Resource Manager,
>
> On January 30, 2015, I received a letter stating on January 12, 2015.
> [sic] I was notified regarding my job-related accommodation. I have
> not received a letter on January 12, 2015. My doctor and I have been
> communicating with Human Resource and others in reference to my
> work injury since I have been off work. The doctor notes and form
> were fax [sic] after my doctor visit signed on January 14, 2015 and a
> second time on January 28, 2015.
>
> Sincerely,
> Tammi Fuqua

*Id.* ¶ 47 & Ex. U; Lagunday Decl. ¶ 15 & Ex. N.  UPS's file for Fuqua's accommodation request

nevertheless remained closed, Lagunday Decl. ¶ 15, and on February 10, 2015 she received a letter

from UPS stating that she had been administratively terminated effective February 7, 2015

because she had been absent for more than twelve months.  Fuqua Decl. ¶ 51.  Fuqua states that

she never received a copy of the Authorization for Release of Health Information form from UPS.

*Id.* ¶ 49.

### 5. Potential Replacement Positions

Fuqua believes that she is qualified for three other positions that UPS advertised as being

open for at least part of the time that Fuqua was injured: Package Data Supervisor, Part-Time

Package Center Supervisor, and Package Dispatch Supervisor.  *Id.* ¶ 56 & Ex. X.  None of those

positions include physical posted job duties and preferred competencies, *see id.* Ex. X; but UPS's

person most knowledgeable testified that all would require some standing and walking and at least

occasional climbing and lifting heavy packages, *see generally* Velez Decl. Ex. J (O'Mahoney

Dep.).  Fuqua believes that she could perform a job that required standing and walking for sixty

percent of the time and sitting for forty percent of the time.  Fuqua Decl. ¶ 56.  Fuqua also states

that in her experience, she has been able to ask others for assistance moving heavy packages and

that UPS encourages employees to ask for such assistance, and trucks are often parked at a loading

dock that does not require climbing.  Fuqua Decl. ¶ 56.  Although not in the context of alternative

17

positions, Rene'a Rismay states in her declaration that, as a supervisor, "Fuqua could have asked one of the employees she supervised to perform any task that would have required her to climb a ladder in order to avoid doing so herself."  Rismay Decl. ¶ 8.

### 6.  Treatment with Dr. Outlaw

In January of 2015, Fuqua began treatment with Dr. Jaseon Outlaw, Ph.D., a psychologist. Kumagai Decl. Ex. F (Outlaw Dep.) 17:18–21.  Dr. Outlaw completed a form after Fuqua's January 13, 2015 appointment indicating some cognitive symptoms, including apathetic affect, scatted thought form, and "loose association" thought progression, although he also indicated that Fuqua had "normal/appropriate" thought content, alert sensorium, average intellectual ability and general knowledge, and normal abstraction, judgment, and remote memory.  *Id.* Ex. 1.  Dr. Outlaw testified at his deposition that as of February of 2015, he did not recommend Fuqua returning to work, in part due to difficulties with cognition and memory, and that she would only have been capable of performing a job that "requires very little cognitive effort," such as working as "a Walmart greeter."  *Id.* 49:9–51:12.

### 7.  Work for Fairfield-Suisun Unified School District

Since 2003, Fuqua has also worked as a special education paraprofessional for the Fairfield-Suisun Unified School District ("FSUSD"), including work at Grange Middle School since 2012, except for a leave of absence from February through June of 2014.  Taylor Decl. (dkt. 39) ¶¶ 1–2, 8.  From mid-August through early June of each year, Fuqua works seven hours per day, Monday through Friday, in a job that, according to a human resources officer, requires standing or walking for eighty percent of the day and sitting for the remaining twenty percent.  *Id.* ¶¶ 3–5 & Exs. B, C.  Fuqua states that the position in fact does not require nearly that much standing and walking, and that she spends much of her day seated at desks in the back of classrooms, although she also sometimes walks around the classrooms or walks students to other locations in the building.  Fuqua Decl. ¶ 53.  Grange Middle School is a single-story building with no stairs, and although there are "a couple of steps" in some areas, there are also wheelchair ramps.  Taylor Decl. ¶ 5.  Overall, Fuqua states that the FSUSD job is significantly less physically demanding than her job at UPS was.  Fuqua Decl. ¶ 55.  Fuqua also states that her "colleagues

18

were supportive of [her] in the months following [her] injury," and she was able to spend less time standing and walking than she otherwise would have. *Id.* ¶ 54. The human resources officer states that Fuqua at times wore a boot on her foot while working for FSUSD, but she told the principal that it was "due to a non-industrial injury, not a FSUSD related industrial injury," and that except for possibly needing to spend more time seated, the injury would not affect her ability to do her job, so she did not need accommodations. Taylor Decl. ¶ 7.

Based on a series of notes from doctors at Kaiser Permanente in Vallejo, California—first from Dr. Jo Anne Cather Lombardi, M.D., and later from Dr. Harry Michael Brown, Ph.D.—Fuqua took a leave of absence from FSUSD from February 6, 2014 through June 11, 2014. *Id.* ¶ 8 & Exs. D, E. After that leave, beginning with the 2013–2014 school year, Fuqua has continued to perform her regular job duties for FSUSD. *Id.* ¶ 9 & Ex. F.

Comer, Lee, Rismay, Murphy, and Mangaoang all state in their declarations that they were not aware that Fuqua also worked at FSUSD when she worked at UPS. Comer Decl. ¶ 8; Lee Decl. ¶ 8; Rismay Decl. ¶ 10; Murphy Decl. ¶ 8; Mangaoang Decl. ¶ 18. Fuqua told Dr. Outlaw that she worked at FSUSD, but he understood it to be a "sporadic" part-time job with limited hours, and did not recall Fuqua telling him that she worked full time. Kumagai Decl. Ex. F (Outlaw Dep.) 54:17–55:20. Dr. Brown, the psychologist, did not recall Fuqua telling him that she had a job at FSUSD and was not aware that she worked regular day shifts there. Kumagai Decl. Ex. D (Brown Dep.) 79:13–80:8. On an Aetna Behavioral Health Clinician Statement, which Dr. Brown understood to be related to an application for disability benefits, Dr. Brown indicated that Fuqua was then doing "no work activities in any capacity," because he "understood she wasn't working at all." *Id.* at 78:25–79:12. Dr. Thomas testified at his deposition that he would not have signed a form in support of Fuqua's disability application had he know she was working full time at FSUSD. Kumagai Decl. Ex. E (Thomas Dep.) 154:17–155:4.

### B. Claims of the Complaint

Fuqua's complaint includes eight claims, all under California law. First, she asserts that UPS violated section 12940(m) of the California Government Code by failing to provide a reasonable accommodation of a disability within the meaning of FEHA. Compl. (dkt. 1) ¶¶ 50–

57. Second, Fuqua asserts that UPS violated section 12940(n) of the Government Code by failing to engage in the interactive process to identify a reasonable accommodation for her disability. *Id.* ¶¶ 58–64. As her third, fourth, and sixth claims, Fuqua asserts that UPS violated section 12940(a) of the Government Code by engaging in discrimination based on disability when it fired Fuqua, *id.* ¶¶ 65–73, implementing a policy of terminating employees after twelve months of leave, which Fuqua contends has a disparate impact on people with disabilities, *id.* ¶¶ 74–82, and failing to respond appropriately to harassment based on discrimination, *id.* ¶¶ 89–96. As her fifth claim, Fuqua asserts that UPS violated section 12940(k) of the Government Code by failing to prevent discrimination. *Id.* ¶¶ 83–88. Seventh, Fuqua asserts that UPS terminated her in violation of public policy, based on the purported FEHA violations set forth above. *Id.* ¶¶ 97–105. Finally, Fuqua asserts that UPS violated section 201 of the California Labor Code by failing to pay all wages due to her. *Id.* ¶¶ 106–09.

### C. Arguments

#### 1. UPS's Motion for Summary Judgment

UPS moves for summary judgment on all claims. *See generally* Mot. (dkt. 33). With respect to Fuqua's failure-to-accommodate claim, UPS presents two inconsistent arguments. First, UPS contends that Fuqua was not disabled, as evidenced by the fact that she maintained her job at FSUSD at all relevant times except from February through June of 2014. Mot. at 18. Second, UPS contends that "[i]f, *arguendo*, the Court finds a genuine issue on the disability element, which it should not," the undisputed facts show that Fuqua was not "a qualified disabled individual" because Dr. Thomas certified in forms related to disability benefits applications that she was unable to work due to her ankle injury from November 3, 2014 through November 15, 2015, and Dr. Outlaw diagnosed Fuqua with cognitive impairments that would purportedly prevent her from working in any capacity in January and February of 2015. *Id.* UPS's motion does not acknowledge the conflict between its contentions that, on the one hand, undisputed facts show that Fuqua was not disabled because she held another job, and on the other hand, undisputed facts show that Fuqua "was unable to perform the essential functions of *any* job, with or without accommodation." *Id.* (emphasis added).

20

UPS also argues that if Fuqua was a qualified disabled individual, her known disabilities were sufficiently accommodated, citing the statements in Rismay's and Mangaoang's declarations that Fuqua was not asked to climb ladders after her injury and could have had the employees who reported to her do that work. *Id.* at 18. UPS contends that modified duties, followed by a year of leave for stress, constitute a sufficient accommodation. *Id.*

With respect to Fuqua's claim for failure to engage in the interactive process, UPS argues that it commenced the process by reaching out to Fuqua on October 24, 2014 to inform her of the process for requesting an accommodation. Mot. at 19. UPS contends that by thereafter giving Fuqua "numerous opportunities over a 3-month period to provide medical forms before closing her file," it engaged in the interactive process in good faith. *Id.* at 19–20. According to UPS, Fuqua "obstructed the interactive process in bad faith" by failing to share opinions from her doctors that she could not work (obtained for the purpose of her disability benefits applications), by failing to tell her doctors about her job at FSUSD, and by purportedly failing to submit the completed form from Dr. Thomas until after her file was closed. *Id.* at 20. UPS also argues that Fuqua cannot prevail on an interactive process claim unless she shows that a reasonable accommodation existed, and that she cannot do so because Dr. Outlaw determined she was unable to work in any capacity. *Id.* at 20–21.

UPS's argument regarding Fuqua's disability discrimination claim is brief:

> To state a cause of action under the FEHA for disability discrimination, Plaintiff must establish that (1) she was disabled; (2) she was qualified for the position she sought or was performing competently in the position she held; (3) she suffered an adverse employment action; and (4) some other circumstance that suggests a discriminatory motive. *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 355 (2000); *Jensen* [*v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 254–55 (2000)].
>
> Plaintiff was terminated in accordance with [UPS policy] because she was absent from her regular occupation for 12 months. At the time of her termination, no ADA request file was open for her. Plaintiff was terminated for legitimate business reasons, despite an alleged disability.

Mot. at 21.

Turning to Fuqua's disparate impact claim, UPS argues that "statistical evidence is

21

paramount," and there is no evidence to show that UPS's policy "treats one group more harshly than another." *Id.* at 21–22. UPS also argues that the policy of terminating employees after twelve months of leave is not susceptible to disparate impact analysis because it is not facially neutral, but instead by its terms only applies to employees on medical leave. *Id.* at 22.

As for the harassment claim, UPS contends that Fuqua was not harassed because: (1) her supervisors were right to credit the Concentra note rather than Dr. Steinberg's note in January of 2014; (2) Mangaoang told Fuqua to only do what she could; (3) Rismay arranged for someone else to climb ladders that day; (4) "there is no dispute that Fuqua could have directed any one of her reports to perform tasks that required her to climb ladders"; (5) disregarding a doctor's note for one shift is not sufficiently "severe or pervasive" to constitute actionable harassment; and (6) all relevant actions "were based on personnel management decisions" and thus do not constitute harassment as a matter of law. *Id.*

UPS argues that Fuqua's claim for wrongful termination in violation of public policy fails because it depends on her FEHA theories, which UPS contends are deficient for the reasons stated above. *Id.* at 23.

With respect to Fuqua's claim for failure to prevent discrimination or harassment, UPS argues that there is no evidence of complaints of harassment being lodged with the company because Fuqua wrote the notes describing purported harassment "not because she was being harassed, but because she misunderstood what was being asked of her," and "believed she was being forced to 'write [herself] up.'" *Id.* (alteration in original). UPS also argues that this claim fails because the underlying conduct does not constitute harassment, as discussed above. *Id.*

UPS contends that it is entitled to summary judgment on Fuqua's Labor Code claim because on October 3, 2013, Fuqua would have been paid if she had recorded a time entry in the UPS system, and on August 7, 2014, Fuqua showed up without notice when she was not scheduled to work and in fact did not work. *Id.* at 23–24.

Finally, UPS argues that Fuqua cannot recover punitive damages on any claim because there is no evidence that any "UPS officer, director or managing agent acted with oppression, fraud or malice toward [Fuqua]." *Id.* at 24.

### 2. **Fuqua's Opposition**

First, with respect to her failure-to-accommodate claim, Fuqua argues that there is ample evidence from several medical professionals that Fuqua was significantly limited by her ankle injury, and that her ability to continue with her job at FSUSD is not dispositive of whether she had a disability for the purpose of FEHA. Opp'n (dkt. 50) at 19–20. With respect to whether she was a "qualified individual," Fuqua contends that California courts are divided as to whether that is part of a plaintiff's prima facie case, but regardless, "California courts have held that 'the mere receipt of disability benefits, as well as representations made by an employee in obtaining them, do not necessarily mean the employee is unable to perform his or her job.'" *Id.* at 20 (quoting *Davis v. L.A. Unified Sch. Dist. Personnel Comm'n*, 152 Cal. App. 4th 1122, 1140 (2007)). Fuqua argues that it is UPS's burden to show that she cannot perform her job or another vacant position to which she could have been reassigned, and asserts that she could have performed three vacant positions if UPS had made a six-month job search program available to her. *Id.* at 21.

Turning to whether UPS actually provided reasonable accommodations, Fuqua argues that "there were numerous incidents in which UPS failed to accommodate" her, including purportedly disregarding the work restrictions imposed by Kaiser and Dr. Steinberg, telling Fuqua that she must be one hundred percent healthy to return to work, and failing to act on the medical form that she ultimately submitted from Dr. Thomas. *Id.*

Next, with respect to the interactive process claim, Fuqua contends that UPS should have commenced the process when she arrived at the Oakland hub on August 7, 2014, rather than waiting until late October of that year. *Id.* at 22. Fuqua also argues that UPS failed to provide her with any of the necessary paperwork after her request to start the process on November 19, 2014, requiring her to contact UPS again on December 29, 2014, and that when UPS eventually provided her with a request packet, it omitted the Authorization for Release of Health Information. *Id.* Fuqua further contends that UPS should have acted on the medical information form from Dr. Thomas, should allow more flexibility than its twelve-month termination plan permits, and should have given her an opportunity to participate in a six-month job search. *Id.* at 23.

As for her discrimination claim, Fuqua argues that she can succeed on a disparate

treatment claim because: "(1) she had limitations that made a life activity, work and climbing, difficult, (2) she was qualified for three vacant positions, (3) she was terminated, and (4) the termination was due to a discriminatory policy." *Id.* With respect to her disparate impact theory, Fuqua briefly asserts that "UPS maintains a 12 month administrative termination policy, regardless of whether an employee is on short or long term disability," and "UPS'[s] policy, although appearing facially neutral, has a discriminatory impact as it precludes an individualized assessment for determination of reasonable accommodation, which several courts have deemed unlawful." *Id.* at 23–24 (citing, *e.g.*, *Scotch v. Art Inst. of Cal.-Orange Cty., Inc.*, 173 Cal. App. 4th 986, 1002 (2009)).

Fuqua contends that there is a genuine dispute of fact as to whether UPS harassed her on account of disability, citing instances including conflicting instructions after her initial injury, Comer telling her that she was making excuses, Comer sending her home, UPS and Liberty Mutual scheduling an appointment at Concentra for her without her knowledge, Comer sending her home for rescheduling that appointment, failure to credit Dr. Steinberg's status note, sending Fuqua home when UPS could have offered modified work, requiring her to sign an essential functions form that she did believed did not reflect her capabilities at the time, "Comer instruct[ing] her to issue herself a write up," and ignoring the complaints that she wrote. *Id.* at 24. Fuqua also argues that the failure to investigate her written complaints on February 3 and 4, 2014 supports a claim for failure to prevent discrimination. *Id.* at 25.

Finally, Fuqua argues that her termination against public policy claim survives for the same reasons as her FEHA claims. *Id.* at 24–25. Fuqua's opposition does not address her Labor Code claim or the issue of punitive damages. *See generally id.*

### 3. UPS's Reply

UPS reasserts in its reply the argument that Fuqua was fully disabled as a matter of law based on her representations in support of disability benefits and assessments by her doctors. Reply (dkt. 54) at 4–5. UPS argues that representations in support of disability benefits applications can establish judicial estoppel, and that case law requires a plaintiff to offer a sufficient explanation of the discrepancy where her failure-to-accommodate claim conflicts with

1  such an application.  *Id.* at 5.  UPS does not renew in its reply the argument that Fuqua was *not*

2  disabled as a matter of law based on her work at FSUSD.  *See id.*

3       UPS also argues again that Fuqua's known disabilities were reasonably accommodated.

4  With respect to the Kaiser work restrictions on October 3, 2013, UPS contends that Fuqua "was

5  not asked to perform her regular job duties," but instead only required to complete paperwork

6  related to her injury, and regardless, "denial of time for a day off does not constitute a failure to

7  reasonably accommodate."  *Id.* at 6.  With respect to the conflict between Concentra's and Dr.

8  Steinberg's work assessments on January 27, 2014, UPS argues that even if Fuqua was not told

9  that another supervisor had been tasked with climbing ladders for her, "it remains undisputed that

10 such an arrangement was made," and that she could have asked other employees who reported to

11 her to climb for her.  *Id.*  With respect to Fuqua's experience when she returned on August 7,

12 2014, UPS argues that Fuqua was reasonably accommodated because she was "allowed to

13 continue with her leave of absence" and because "it is undisputed that Mangaoang contacted Risk

14 Management to advise that [Fuqua] attempted to return with restrictions, in accordance with

15 company policy."  *Id.* at 6–7.[13]  Finally, with respect to Fuqua's eventual termination, UPS asserts

16 that a "finite leave of absence is a reasonable accommodation as a matter of law."  *Id.* at 7 (citing

17 *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 (1999)).

18      As for the interactive process claim, UPS again argues that Fuqua acted in bad faith by

19 failing to meet deadlines and failing to fully inform UPS of her disability applications and related

20 medical assessments, and that "any breakdown in the process lies with her."  *Id.* at 7–8.  This

21 portion of UPS's brief includes certain dubious representations as to which facts are "not

22 disputed," including the assertion that UPS sent Fuqua an ADA packet on November 19, 2014,

23 when there in fact appears to be no dispute that the packet sent that day was not sent to Fuqua's

24

25 [13] UPS states in a footnote that Mangaoang's purported comment that Fuqua should not return until fully recovered "is taken out of context," because "[i]t is undisputed that any such comment
26 was made when Mangaoang was explaining to [Fuqua] what, in Mangaoang's experience, usually happens when an injured employee returns to work, but that is a case by case issue and that it may
27 not apply to [Fuqua]."  Reply at 7 n.3 (citing Mangaoang Decl. ¶ 15).  The cited paragraph of Mangaoang's declaration does not, however, establish that the purported comment was made in
28 such a context, or that Mangaoang made clear that "it may not apply" to Fuqua.  *See* Mangaoang Decl. ¶ 15.

address. *See id.* at 7. UPS contends that it did not fail to engage in the interactive process when Fuqua appeared at the Oakland hub on August 7, 2014 because Fuqua failed to provide notice that she would be coming to work, and because UPS eventually sent her a letter on October 24, 2014. *Id.* at 8–9.

UPS also argues that there is no genuine issue of fact that Fuqua could not perform any of the three vacant positions she identified. *Id.* at 9–10. With respect to the Package Dispatch Supervisor job, UPS contends that Fuqua could not climb ladders, stand for seventy percent of the workday, squat, or lift seventy pounds without assistance. *Id.* at 9. With respect to the Package Data Supervisor position, UPS contends that Fuqua could not squat or lift seventy pounds unassisted, and that she failed to show that she could work a 1:00 AM to 7:00 AM shift while maintaining her job at FSUSD, which starts at 8:30 AM. *Id.* at 10. With respect to the Package Center Supervisor position, UPS contends that Fuqua could not squat, lift seventy pounds unassisted, or climb stairs for fifty percent of the day, and that the position was not open during the interactive process because it was posted on September 16, 2014 and closed on September 30, 2014. *Id.* UPS also argues that an "employer is not required to reallocate essential job functions to other employees," and that Fuqua's mental impairments would prevent her from performing the cognitive requirements of those positions. *Id.* at 9–10.

Turning to Fuqua's discrimination claim, UPS argues that she cannot prevail on a disparate treatment theory because she was not qualified for her position or any of the alternative positions she identified, and FEHA does not prohibit termination where a disability renders an employee incapable, even with reasonable accommodations, of performing the essential functions of a job. *Id.* at 10–11. UPS also argues again that Fuqua cannot proceed on a disparate impact theory because she has not provided statistical or other evidence to show that UPS's twelve-month policy is facially neutral but falls more harshly on one group than another. *Id.* at 11–12.

With respect to Fuqua's harassment claim, UPS argues that requiring an employee to complete paperwork after an injury is "a personnel management decision" and not harassment, and that Comer's purported comment that Fuqua was making excuses and his decision to send her home on two days are not sufficiently severe or pervasive to support a claim. *Id.* at 12–13. UPS

26

contends that the evidence shows Liberty Mutual, not UPS, scheduled Fuqua's January 16, 2014 Concentra appointment, and that all of UPS's actions in response to Fuqua failing to attend that appointment were valid "personnel management decisions." *Id.* at 13. UPS argues that any failure to honor Dr. Steinberg's work restrictions in January of 2014 similarly constituted a permissible management decision, and similarly failed to reach the level of severe and pervasive harassment. *Id.* UPS contends that the requirement that Fuqua sign off on her essential duties was a routine policy by Comer that applied to other employees as well, and that any perception that she was asked to "write herself up" was a misunderstanding. *Id.* at 13–14. As for the failure-to-prevent claim, UPS argues that Fuqua's February 3 and 4, 2014 notes related to failure to honor Dr. Steinberg's note, and therefore "there was nothing to investigate" because the issue of Fuqua's work restrictions had been resolved at that point. *Id.* at 14.

UPS again contends that Fuqua's termination in violation of public policy claim rises or falls with her FEHA claims. UPS concludes by arguing that it should be granted summary judgment or adjudication on Fuqua's Labor Code claim and prayer for punitive damages because Fuqua did not address those issues in her opposition.

## III.    ANALYSIS

### A.    Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**B.    Fuqua's Disparate Treatment Discrimination Claim Presents Issues of Fact**

Fuqua's third claim, for disparate treatment discrimination on account of disability, presents a logical starting point for the Court's analysis because it encompasses a number of issues relevant to other claims at issue. For the reasons discussed below, the Court DENIED UPS's motion as to this claim.

FEHA provides, in relevant part, that an employer may not "because of the . . . physical disability . . . of any person, . . . discharge the person from employment . . . [or] discriminate against the person in compensation or in terms, conditions or privileges of employment." Cal. Gov't Code § 12940(a). A prima facie case of disability discrimination requires Fuqua to establish that she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations; and (3) was subjected to an adverse employment action because of the disability or perceived

disability. *Wills v. Super. Ct.*, 195 Cal. App. 4th 143, 159–60 (2011); *see also Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344–45 (2008); *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 797 (N.D. Cal. 2015). UPS has not shown the absence of a genuine issue of fact as to any of these elements.

### 1. Whether Fuqua Had a Disability

In general, "FEHA contains a broader disability standard than does the [federal] ADA." *Diaz v. Fed. Express Corp.*, 373 F. Supp. 2d 1034, 1049 (C.D. Cal. 2005); *see also EEOC v. United Parcel Serv., Inc.*, 424 F.3d 1060, 1068–70 (9th Cir. 2005). Among FEHA's several nonexclusive definitions of "physical disability" is having, or being regarded or treated by the employer as having, any physical condition that makes achievement of a major life activity difficult. Cal. Gov't Code § 12926(m)(1), (4). Unlike the ADA, FEHA does not require a "substantial" limitation of such an activity, and "the California Supreme Court [has] expressly disapproved an appellate court's holding that [an] employee could not prove his case because he offered evidence of 'only minor limitations.'" *United Parcel Serv.*, 424 F.3d at 1071 (citing *Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019, 1031 n.6 (2003)).

UPS argues briefly that Fuqua "was not disabled" because her continued work at FSUSD demonstrates that she "was not limited in any major life activity including, working." Mot. at 18. UPS cites no authority for the proposition that a plaintiff's ability to perform a different job with different duties establishes as a matter of law that she has no disability within FEHA's broad definition of that term, and UPS does not pursue this argument in its reply.

"'Major life activities' shall be broadly construed and includes physical, mental, and social activities and working." Cal. Gov't Code § 12926(m)(1)(B)(iii). The Ninth Circuit has held that one of the ways in which "FEHA's definition of disability is broader" than that of the ADA is that "it encompasses a limitation in a 'particular employment,' which must be something less than a 'class of jobs' or a 'broad range of jobs,'" and that a limitation affecting the plaintiffs' ability in that case to work as commercial delivery drivers was a cognizable disability. *United Parcel Serv.*, 424 F.3d at 1072–73 (citing Cal. Gov't Code § 12926.1(c)). Without reaching the question of whether climbing ladders is itself a "major life activity" within the meaning of FEHA, a

29

1    reasonable jury could find that the restrictions on walking and climbing imposed by Fuqua's ankle

2    injury—as supported by a plethora of medical evidence in the record—would cause her difficulty

3    in working as a shipping hub package handling supervisor or in similar positions, and thus satisfy

4    FEHA's definition of a disability.[14]

5            **2. Whether Fuqua Could Perform Essential Duties**

6            The next element of disability claim is that the plaintiff must have been able to perform the

7    essential duties of the job, with or without reasonable accommodation. *See Wills*, 195 Cal. App.

8    4th at 159–60. UPS contends that Fuqua cannot established that she was able to do so because

9    two of her treating doctors, Drs. Thomas and Outlaw, stated that she was unable to work at all at

10   certain times, *see* Mot. at 18, and because Fuqua herself represented that she was unable to work

11   when she applied for disability benefits in the fall of 2015, *see* Reply at 4–5.

12           As for Fuqua's receipt of benefits, California courts have "stated that the mere receipt of

13   disability benefits, as well as representations made by an employee in obtaining them, do not

14   necessarily mean the employee is unable to perform his or her job." *Davis v. L.A. Unified Sch.*

15   *Dist. Personnel Comm'n*, 152 Cal. App. 4th 1122, 1140 (2007) (citing *Jackson v. County of Los*

16   *Angeles*, 60 Cal. App. 4th 11, 184–88 (1997)). The United States Supreme Court has held the

17   same in the parallel context of federal Social Security Disability Insurance ("SSDI") benefits and

18   disability discrimination claims under the ADA, noting that the SSDI process does not account for

19   reasonable accommodations, relies for the sake of efficiency on presumptions that may not reflect

20   the actual facts at issue in a discrimination claim, and in some circumstances allows for payment

21   of benefits to people who are in fact working, at least on a trial basis. *Cleveland v. Policy Mgmt.*

22   *Sys. Corp.*, 526 U.S. 795, 802–05 (1999). In *Cleveland*, the Court held that a plaintiff must offer a

23   sufficient explanation for the apparent contradiction, but that application for and receipt of

24   disability benefits did not per se bar a plaintiff from bringing a claim under the ADA, or even

25

26   _____

27   [14] Moreover, even if Fuqua's job at FSUSD could establish that she did not actually have a
     disability, UPS's perception that Fuqua suffered from a disability would be sufficient to satisfy
     this element of a disability discrimination claim. *See Wills*, 195 Cal. App. 4th at 159–60. Given

28   that UPS and its employees did not know before Fuqua was terminated that she worked at FSUSD,
     her employment there has no bearing on whether UPS perceived Fuqua as having a disability.

restrict such claims to "'some limited and highly unusual set of circumstances.'" *Id.* at 805–07 (quoting and reversing the lower court's decision). The Ninth Circuit has also held that judicial estoppel does not necessarily apply where an ADA plaintiff previously represented that she was disabled in the context of an application for benefits, stating that a "'[s]traightforward summary judgment analysis'" is usually preferable and sufficient "to protect the sanctity of the judicial process," although estoppel may be appropriate "in clear-cut cases" where "a claimant is playing fast and loose with the courts" and her inconsistent statements "amount to an affront to the court." *Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir. 1998) (quoting *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 382 (9th Cir. 1998)), *abrogation in part on other grounds recognized by Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 995 (9th Cir. 2012).

In an ADA case predating *Cleveland* on which UPS relies here, the Ninth Circuit affirmed summary judgment for an employer on the basis of the plaintiff's doctor's deposition testimony that she was totally disabled and thus not qualified to work in any position, as corroborated by the plaintiff's own representations on disability benefit claim forms. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481–82 (9th Cir. 1996). The court held that because the plaintiff's own deposition testimony to the contrary was "uncorroborated and self-serving," and because it contradicted her prior sworn statements in the context of her disability applications, it did "not present 'a sufficient disagreement to require submission to a jury.'" *Id.* at 1481 (quoting *Anderson*, 477 U.S. at 251–52). UPS also cites *Swonke v. Sprint Inc.*, 327 F. Supp. 2d 1128, 1133–35 (N.D. Cal. 2004), in which Judge Henderson held that uncontroverted opinions from the plaintiff's medical providers that he was unable to work, as well as the plaintiff's own assertion of total disability on applications for benefits, warranted granting summary judgment for the employer on the basis that the plaintiff was not qualified to work.

This case differs from *Kennedy* and *Swonke* because there is evidence, beyond Fuqua's own statements, that she was not totally disabled. Specifically, as discussed in the context of UPS's previous argument that Fuqua was as a matter of law *not* disabled, Fuqua held and performed a full time job at FSUSD during virtually the entire time period at issue. *See* Taylor Decl. ¶ 9. While Fuqua's ability to perform a different job does not necessarily establish in itself

31

that she could perform her job at UPS (with or without accommodation), that fact contradicts her doctors' statements that she could not work at all, and constitutes evidence on which a jury could find those statements not credible. And while Fuqua's apparent failure to reveal her job at FSUSD to the state disability agency raises questions about her candor in applying for benefits, this civil action between Fuqua and UPS is not the forum to resolve such issues. Under precedent disfavoring judicial estoppel in similar cases, barring Fuqua's claim based on a theory of estoppel "under the circumstances presented here would be inappropriate given that the truth-seeking function of the court would be supplanted by an agency administrative decision rendered without an evidentiary hearing." *Griffith*, 135 F.3d at 382. Because there is evidence that Fuqua could work, the Court declines to grant summary judgment for UPS based on statements that she could not work.

Fuqua contends that she could have been accommodated by, consistent with UPS's ADA compliance policies, allowing her to conduct a six-month internal job search for open positions compatible with her restrictions and to work in one of the three positions she identified. *See* Opp'n at 17. UPS does not dispute that transfer to a suitable open position would be a reasonable accommodation, but argues that Fuqua could not have performed the essential functions of any of the positions at issue, because she could not climb ladders or steps, stand for seventy percent of the workday, squat, lift seventy pounds without assistance, or perform various cognitive tasks. *See* Reply at 9–10 (addressing these issues in the context of Fuqua's interactive process claim).

Determining the "essential functions" of a particular position is a "highly fact-specific inquiry." *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001); *Lui v. City & County of San Francisco*, 221 Cal. App. 4th 962, 971 (2012); *see also Dep't of Fair Emp't & Housing v. Lucent Techs., Inc.*, 642 F.3d 728, 744 (9th Cir. 2011) ("The question of whether an alternative position was available frequently raises a genuine issue of material fact in reasonable accommodation cases."). The difficulty of determining essential functions with certainty is compounded in this case by the scant factual record regarding the positions at issue. Sheilah O'Mahony, designated as UPS's person most knowledgeable on the subject, testified at her Rule 30(b)(6) deposition to the job descriptions for those positions, but was generally unable to say how

frequently the positions required the physical activities at issue, or in some cases unable to say with certainty whether they required them at all. *See, e.g.*, Velez Decl. Ex. J (O'Mahony Dep.) 31:19–22 ("Q. Okay. For the Package Dispatch Supervisor, do you know if -- if that position . . . required any climbing ladders? A. Possibly, yes."). Moreover, there is some evidence that UPS policy permitted supervisors[15] to delegate strenuous tasks to other employees, as stated not only in Fuqua's declaration but also in the declaration of Rene'a Rismay, submitted by UPS. *See* Fuqua Decl. ¶ 56 (stating that in Fuqua's experience at UPS, she was able, and was encouraged by UPS, to request assistance with loading tasks that she was unable to complete herself); Rismay Decl. ¶ 8 (stating that when Fuqua returned to work in January of 2014, she "could have asked one of the employees she supervised to perform any task that would have required her to climb a ladder in order to avoid doing so herself"); *see also* Reply at 6 (asserting that "it is undisputed that [Fuqua] could have asked any one of her reports to do any task that required her to climb ladders").

UPS is correct that FEHA "'does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employee.'" *See Lucent Techs.*, 642 F.3d at 744 (quoting *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006)); *see also* Reply at 9–10. If, however, UPS already permitted and encouraged supervisors to request assistance or delegate tasks to other employees as needed, drawing all reasonable inferences in favor of Fuqua, a jury might find that the physical tasks Fuqua was restricted from performing were not in fact essential duties for the jobs at issue, particularly where they made up only a small portion of a position's regular work. *See, e.g.* Velez Decl. Ex. J (O'Mahony Dep.) 38:8–39:6 (testifying that O'Mahony believed the Package Data Supervisor position required climbing not less than five percent of the time, but that she was not sure if it required climbing ten percent of the time).

With respect to the cognitive requirements of the positions at issue, the record is not sufficiently clear as to Fuqua's limitations to warrant summary judgment on that basis. Dr. Outlaw stated at his deposition that he would not recommend that Fuqua work in any capacity

---

[15] All of the potential alternative roles Fuqua identifies were supervisor positions.

when he treated her in early 2015 because it might impede her recovery, but that she could have worked as "a Walmart greeter" or "some other jobs." Kumagai Decl. Ex. F (Outlaw Dep.) 49:9–51:12. Earlier, in the summer of 2014, Dr. Brown assessed Fuqua as experiencing confusion and inability to focus, but nevertheless approved her return to her previous position with limited hours. Fuqua Decl. Ex. O; Kumagai Decl. Ex. D (Brown Dep.) Ex. F. Neither doctor knew that Fuqua worked full time at FSUSD in the fall of 2014 and thereafter. Kumagai Decl. Ex. D (Brown Dep.) 79:13–80:8; *id.* Ex. F (Outlaw Dep.) 54:17–55:20. Setting aside UPS's bare assertions that Fuqua's mental impairments rendered her unable to perform the alternative positions she now identifies, *see* Reply at 10, no party cites evidence specifically addressing the application of Fuqua's psychologists' diagnoses to the cognitive requirements of those positions, or comparing those requirements to the duties she was able to perform at FSUSD. To the extent that Dr. Outlaw's testimony could be construed as stating that Fuqua lacked the cognitive ability to perform the jobs at issue—as opposed to merely that he would not recommend she do so—a jury drawing all reasonable inferences in Fuqua's favor could hold to the contrary on this record, particularly in light of Fuqua's continued full time work at FSUSD and Brown's approval for her to return to her previous job with limited hours.

UPS also asserts that the schedule for the Package Data Supervisor position would not be compatible with Fuqua's job at FSUSD, and that the Part-Time Package Center Supervisor position should not be considered because it was only open from September 16 through September 30, 2014, which UPS characterizes as showing that that the job "was not available during the interactive process." Reply at 10. UPS cites no authority for the proposition that potentially conflicting demands of a plaintiff's second job—which a plaintiff could presumably choose to forego if offered an alternative position with the defendant employer—are relevant to whether she is qualified to perform the position in question. As for the position that was only listed as open in mid-September, it is not clear how UPS reached the conclusion that it "was not available during the interactive process," when Fuqua first returned to UPS and presented her doctors' reports to Comer in early August of 2014, and Mangaoang received a notification on August 25, 2014 that Fuqua sought to return to work on September 1, 2014. *See* Fuqua Decl. ¶ 38; Mangaoang Decl.

34

¶ 17 & Ex. E.

For the reasons discussed above, the Court holds that UPS has not met its burden to show that no reasonable jury could find Fuqua unable to perform the essential duties of her position at UPS (or an available alternative position), with or without reasonable accommodation.

### 3. Whether Fuqua Experienced Adverse Employment Action on Account of Disability

For the final element of Fuqua's disability discrimination claim, UPS contends it did not impermissibly discriminate against Fuqua, but instead terminated her for a legitimate business reason because her disabilities rendered her unable to perform the essential duties of her job, even with reasonable accommodation. *See* Reply at 11. For the same reasons discussed in the context of the second element, the Court holds that a reasonable jury could find to the contrary. UPS also argues that Fuqua's termination was legitimate because it was based on UPS's policy regarding a one-year maximum leave of absence and "no ADA request file was open for her" at the time she was terminated. Mot. at 21. The Court is not persuaded that UPS's policy shields it from liability if Fuqua prevails on the theory that UPS did not let her return from leave even though her disability could have been accommodated.

\* \* \*

Because there are genuine issues of material fact relevant to each of the three elements of the test for disparate treatment disability discrimination under FEHA, the Court DENIED UPS's motion for summary judgment as to this claim

### C. Whether Fuqua's Termination Violated Public Policy Presents Issues of Fact

Both parties agree that Fuqua's seventh claim, a common law claim for wrongful termination in violation of public policy, stands or falls with her disparate treatment discrimination claim under FEHA. Mot. at 23; Opp'n at 24–25; Reply at 14; *see City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1161 (1998). Because the Court denied UPS's motion as to Fuqua's disparate treatment claim, the Court also DENIED the motion as to her common law wrongful termination claim.

### D. Whether UPS Provided Reasonable Accommodations Presents Issues of Fact

Fuqua's first claim is for failure to provide a reasonable accommodation under FEHA, which makes it unlawful "for an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an applicant or employee." Cal. Gov't Code § 12940(m). Under FEHA, an employer's failure to reasonably accommodate a disabled employee is a violation of the statute in and of itself. The elements of a prima facie claim for failure to make reasonable accommodation claim are: (1) the plaintiff has a disability covered by FEHA; (2) the plaintiff is qualified to perform the essential functions of the position; and (3) the employer failed to reasonably accommodate the plaintiff's disability. *Scotch*, 173 Cal. App. 4th at 1010. "Reasonable accommodation" means a "modification or adjustment to the workplace that enables a disabled employee to perform the essential functions of the job held or desired." *Taylor v. Trees, Inc.*, 58 F. Supp. 3d 1092, 1111 (E.D. Cal. 2014); *see also* Cal. Gov't Code § 12926(p). The reasonableness of an accommodation is generally a question of fact. *Hanson*, 74 Cal. App. 4th at 228 n.11. A claim under section 12940(m) differs from a section 12940(a) discrimination claim in that a plaintiff need not prove any adverse employment action, nor is any showing of a causal nexus between one's disability and an adverse employment action required. *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 255−56 (2000).

As discussed above in the context of Fuqua's disparate treatment claim, a jury could reasonably find that Fuqua had a disability within the meaning of FEHA, and that she could have performed essential duties at UPS with reasonable accommodation.

UPS also argues that it provided reasonable accommodations by allowing modified work in 2013 and early 2014 and a one-year leave of absence thereafter. Mot. at 18; Reply at 6–7. There is contradictory evidence in the record as to whether UPS limited Fuqua's duties to avoid climbing ladders when she came to work on January 27, 2014. *Compare* Rismay Decl. ¶¶ 7, 13 (stating that Rismay told Fuqua to only do what she could, and assigned another employee to climb ladders for her), *with* Fuqua Decl. ¶ 24 (stating that Mangaoang required Fuqua to climb ladders that day, Rismay did not say anything to the contrary, and Fuqua exacerbated her injury climbing ladders). A jury could find on this record that Fuqua's disability was not reasonably

accommodated that day.

With respect to the period in the summer of 2014 through early 2015, when Fuqua sought to return to work, UPS argues that allowing Fuqua to remain on leave was "a reasonable accommodation as a matter of law," and an employer is not required to give a particular accommodation sought by an employee so long as the employer provides some reasonable accommodation. *See* Reply at 6–7 (citing *Raine v. City of Burbank*, 135 Cal. App. 4th 1215, 1222–23 (2006); *Hanson*, 74 Cal. App. 4th at 228). UPS is correct that "FEHA does not obligate an employer to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks." *Raine*, 135 Cal. App. 4th at 1222. The accommodation must, however, be "reasonable," *id.*, and UPS's other contention—that a finite leave of absence is per se reasonable—goes too far. Instead, the California Court of Appeal held in *Hanson* "that a finite leave *can* be a reasonable accommodation under FEHA, *provided* it is likely that at the end of the leave, the employee would be able to perform his or her duties." *Hanson*, 74 Cal. App. 4th at 226 (emphasis added). It follow that such leave is generally *not* a reasonable accommodation if the employee is not likely to recover his or her ability to perform the job by the end of the leave, and even where that condition is satisfied, *Hanson* did not go so far as to hold that leave is *always* a sufficient accommodation. *See id.* Here, it is not clear from the record that it was "likely" that Fuqua would have fully recovered by the end of her one-year leave, and based on the reports that she continued to obtain from Dr. Thomas in early 2015, it appears that she did not. *See* Fuqua Decl. ¶ 45 & Ex. R. A jury could reasonably find that merely providing finite leave to Fuqua without an expectation of recovery before the end of that period—or in other words, with an expectation that Fuqua would ultimately be terminated rather than return to work—was not a reasonable accommodation.

Because a reasonable jury could find that Fuqua had a disability, that she was capable of performing her essential duties with accommodation, and that UPS failed to provide a reasonable accommodation, the Court DENIED UPS's motion as to Fuqua's failure-to-accommodate claim.

## E. Whether UPS Engaged in the Interactive Process Presents Issues of Fact

The second claim of Fuqua's complaint asserts that UPS failed to engage in the interactive

1  process to identify an accommodation for her disability.  Under FEHA, an employer's failure "to

2  engage in a timely, good faith, interactive process with the employee . . . to determine effective

3  reasonable accommodations" is a violation of the statute separate from any failure to make

4  reasonable accommodations for a qualified employee's disability.  Cal. Gov't Code § 12940(n);

5  *Wilson v. County of Orange*, 169 Cal. App. 4th 1185, 1993 (2009).  FEHA imposes on employers

6  a mandatory obligation to engage in the interactive process once an employee requests an

7  accommodation for a disability, or when the employer itself recognizes the need for one.  *Brown v.*

8  *Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001).  Once initiated, the employer has a

9  continuous obligation to engage in the interactive process in good faith.  *Swanson v. Morongo*

10  *Unified Sch. Dist.*, 232 Cal. App. 4th 954, 971 (2014).  The interactive process "requires

11  communication and good-faith exploration of possible accommodations between employers and

12  individual employees with the goal of identifying an accommodation that allows the employee to

13  perform the job effectively."  *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 919 (E.D. Cal.

14  2013).  "Each party must participate in good faith, undertake reasonable efforts to communicate its

15  concerns, and make available to the other information which is available, or more accessible, to

16  one party," and "responsibility for [a] breakdown [in communications] lies with the party who

17  fails to participate in good faith."  *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 62 n.22

18  (2006).  To prevail on a section 12940(n) claim, an employee must identify a reasonable

19  accommodation that would have been available at the time the interactive process should have

20  occurred.  *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 379 (2015).[16]

21       UPS contends that it satisfied this requirement by "reaching out to [Fuqua] on October 24,

22  2014, to advise her that she can request a job-related accommodation under the ADA," and by

23  sending follow-up letters and forms thereafter.  Mot. at 19.  But Fuqua first requested to return to

24

---

25  [16] The Court recognizes that there is some disagreement among the California appellate courts as
   to whether a plaintiff bringing an interactive process claim under § 12940(n) must show that a

26  reasonable accommodation was in fact available.  *See, e.g.*, *Claudio v. Regents of Univ. of Cal.*,
   134 Cal. App. 4th 224, 246 (2005) ("Because we shall conclude a triable issue exists as to whether

27  the University failed to participate in the interactive process, it cannot be known whether an
   alternate job would have been found.").  The Court nevertheless concludes that the requirement for

28  such a showing, as stated in *Nealy*, represents the more common view and more likely reflects
   how the California Supreme Court would address the issue.

work with accommodations when she attempted to return on August 7, 2014, at which time—according to Fuqua—Mangaoang told her that she could not return until she was one hundred percent healthy. *See* Fuqua Decl. ¶ 38; *Gelfo*, 140 Cal. App. 4th at 62 n.22 ("Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation."). Fuqua submitted more formal notice that she was seeking to return to work in late August of 2014, but still apparently did not receive any communication from UPS regarding potential accommodation, or the process for seeking accommodation, until late October. *See* Mangaoang Decl. ¶ 17; Fuqua Decl. ¶¶ 40–41. After Fuqua asked for an accommodations request packet in mid-November, UPS sent a packet to a different address than it had on file for Fuqua, *see* Lagunday Decl. ¶ 5, and Fuqua states that she did not receive that packet or certain subsequent letters that UPS claims to have sent, and that UPS failed to include the purportedly necessary Authorization for Release of Health Information form in any later mailings. Fuqua Decl. ¶¶ 42, 44, 47. UPS ultimately closed the file on Fuqua's request for accommodation due to her failure to submit necessary forms, including the release authorization, and terminated her when she reached twelve months of leave. Lagunday Decl. ¶¶ 12, 14 & Exs. J, K, M. The Court is satisfied that a jury could, drawing all reasonable inferences in favor of Fuqua, find on these facts that UPS failed to engage in the interactive process in good faith.

UPS also argues that it is entitled to summary judgment because Fuqua "acted in bad faith and any breakdown in the process lies with her." Reply at 8. For the purpose of UPS's motion, the Court need not decide whether a jury reasonably *could* find that instances of delay, failure to provide information, or failure to follow proper procedure on Fuqua's part evince bad faith. In order to prevail in this context, UPS must show that no reasonable jury could find otherwise—that *any* reasonable jury would lay the blame for the breakdown of communications on Fuqua rather than on UPS, even drawing all reasonable inferences in Fuqua's favor. The record is not so clear as to support such a finding. The Court therefore DENIED UPS's motion to dismiss Fuqua's interactive process claim.

**F.     No Genuine Issues Exist Regarding Disparate Impact**

In addition to her disparate treatment theory, Fuqua brings her fourth claim for disability discrimination under FEHA based on a theory of disparate impact.  FEHA prohibits "discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (referred to as disparate impact discrimination)."  *Avila v. Cont'l Airlines, Inc.*, 156 Cal. App. 4th 1237, 1246 (2008). The Ninth Circuit has described the requirements for a disparate impact claim under the federal Civil Rights Act as follows:

> In the typical disparate impact case, in which the plaintiff argues that a selection criterion excludes protected applicants from jobs or promotions, the plaintiff proves discriminatory impact by showing statistical disparities between the number of protected class members in the qualified applicant group and those in the relevant segment of the workforce. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989). While such statistics are often difficult to compile, whether the protected group has been disadvantaged turns on quantifiable data. When the alleged disparate impact is on the conditions, terms, or privileges of employment, however, determining whether the protected group has been adversely affected may depend on subjective factors not easily quantified. The fact that the alleged effects are subjective, however, does not relieve the plaintiff of the burden of proving disparate impact. The plaintiff may not merely assert that the policy has harmed members of the group to which he or she belongs. Instead, the plaintiff must prove the existence of adverse effects of the policy, must prove that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, must prove that the adverse effects are significant, and must prove that the employee population in general is not affected by the policy to the same degree.

*Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993); *see also Gardner v. Fed. Express Corp.*, 114 F. Supp. 3d 889, 900 (N.D. Cal. 2015) (quoting and applying the standard of *Garcia* in the context of a disparate impact disability discrimination claim under FEHA).

Fuqua argues that her disparate impact claim should go forward based on UPS's policy of terminating employees after twelve months of leave, contending that the policy "although facially neutral, has a discriminatory impact as it precludes an individualized assessment for determination of reasonable accommodation, which several courts have deemed unlawful."  Opp'n at 23–24 (citing *U.S. Airways v. Barnett*, 535 U.S. 391, 397 (2002); *Garcia-Ayala v. Lederle Parenterals*,

*Inc.*, 212 F.3d 638 (1st Cir. 2000); *Scotch*, 173 Cal. App. 4th at 1002).

Fuqua's assertion that the policy "precludes an individualized assessment," *id.*, is contrary to the record. UPS's policy provides that an employee will not be terminated under the twelve-month rule if an accommodation request is pending when the time period expires, and Lagunday states in her declaration that employees who request accommodation "are assessed individually before the administrative separation [i.e., termination] occurs" and can be eligible for extended leave beyond twelve months if UPS determines that to be a reasonable accommodation. Lagunday Decl. ¶ 3 & Ex. A. Fuqua identifies no evidence contradicting Lagunday's characterization of the policy.

Regardless, Fuqua has not made the sort of showing necessary to prevail on a disparate impact claim. It is not entirely clear from the record whether the twelve-month policy is limited to disability leave or also applies to leave taken for other reasons. If the former, the policy might or might not be permissible under FEHA, but a disparate impact theory is not the appropriate framework in which to consider it because it is not facially neutral—by its terms, it only affects employees with disabilities. *See Avila*, 156 Cal. App. 4th at 1246 (describing a disparate impact theory as "discrimination resulting from an employer's facially neutral practice or policy"). If the policy also applies to leave for reasons other than disability, and is thus facially neutral, Fuqua "has not provided any statistical evidence comparing the impact of [the policy] on disabled employees to its impact on the general employee population," and "[a]bsent this evidence, [she] cannot prevail on a disparate impact claim." *Gardner*, 114 F. Supp. 3d at 900. The Court therefore GRANTED UPS's motion as to Fuqua's disparate impact claim.[17]

### G.    Whether UPS Harassed Fuqua Presents Issues of Fact

Fuqua's sixth claim is for harassment on account of disability in violation of FEHA. "To

---

[17] In granting UPS's motion as to this claim, the Court makes no finding as to the legitimacy of UPS's policy or whether applicable law might require an exception to that policy, and this order should not be construed as holding that the policy is in itself a defense to any of Fuqua's remaining claims. *See Barnett*, 535 U.S. at 397 ("By definition any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the [ADA's] potential reach.").

establish a claim for harassment [under FEHA], a plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to harassment because she belonged to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (citing *Aguilar v. Avis Rent A Car Sys., Inc.*, 21 Cal. 4th 121 (1999)). UPS moves for summary judgment on the grounds that purported incidents of harassment were not so severe or pervasive to be actionable, and that "personnel management decisions" do not constitute harassment under California law. Mot. at 22; Reply at 12–14.

"[D]iscrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 707 (2009), *modified*, (Feb. 10, 2010). Harassment does not include "[c]ommonly necessary personnel management actions," such as reassignment, disciplinary warnings, and termination. *Id.* at 707–08 (quoting *Reno v. Baird*, 18 Cal. 4th 640, 646 (1998)). These personnel management actions can, however, be evidence of harassment because "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message." *Id.* at 709.

In *Roby*, the California Supreme Court clarified the distinction between harassment and discrimination under FEHA. *Id.* at 705–11. There, plaintiff Charlene Roby brought claims under FEHA against her employer for discrimination, failure to accommodate her disability, and harassment, and she brought the harassment claim against her direct supervisor as well. *Id.* at 697. The jury found for Roby on all claims, but the appellate court reversed the jury's verdict on harassment because of insufficient evidence. *Id.* at 700. The appellate court reasoned that because "commonly necessary personnel management actions" do not constitute harassment, it should "sift[] out" "business and management" activities when assessing the sufficiency of the harassment evidence. *Id.* at 700, 710.

The California Supreme Court reversed, reinstating the harassment verdict. *Id.* at 720. The court reasoned that because official employment actions can communicate a hostile message,

42

official actions against Roby should have been considered as evidence of harassment alongside other harassing actions. *Id.* at 708–09. The Court concluded that the evidence was "ample to support the jury's harassment verdict" against the employer and supervisor in light of the official employment actions against Roby—such as termination and disciplinary warnings—and the supervisor's harassing conduct, including "demeaning comments to Roby," "refusal to respond to Roby's greetings," "demeaning facial expressions and gestures towards Roby," and "disparate treatment of Roby in handing out small gifts." *Id.* at 708–10. *Roby* thus shows that under California law, a FEHA plaintiff may establish a supervisor's liability for harassment by providing evidence of hostile interactions along with supplemental evidence of official employment actions that reinforce an underlying hostile message. *See id.* at 708–10.

As in *Roby*, there is at least some evidence in this case of hostile personal interactions beyond the type of pure management decisions that, on their own, California courts do not consider harassment. For example, Fuqua states in her declaration that Comer initially responded to her injury by telling her "in a sarcastic voice, that he had heard [she] was trying to come up with every excuse not to show up to work," and later told her that he did not believe her explanation of how she was injured. Fuqua Decl. ¶¶ 11, 12. Other incidents arguably straddle the line between official action and hostile interpersonal relations, such as Lee threatening Fuqua with infractions that were never issued, and Comer telling Fuqua not to return to work until she rescheduled an appointment but then sending a text message telling her to report for her shift on less than one day's notice,. *Id.* ¶ 8, 20–21; Lee Decl. ¶ 6. Given that there is some evidence of hostility, more official actions—such as UPS purportedly declining to honor a doctor's restrictions, informing Fuqua that she could not return to work until fully healthy, failing to send her the forms necessary for an accommodation request, and ultimately terminating her—can also permissibly be considered in determining whether "hostility was pervasive and effectively changed the conditions of [Fuqua's] employment." *See Roby*, 47 Cal. 4th at 710. The Court therefore declined to grant summary judgment and DENIED UPS's motion as to this claim.

**H.     Whether UPS Failed to Prevent Discrimination Presents Issues of Fact**

Fuqua's fifth claim asserts that UPS violated FEHA by failing to prevent discrimination against her.  FEHA makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment . . . from occurring."  Cal. Gov't Code § 12940(k).  A plaintiff seeking to recover on a failure-to-prevent-discrimination claim under FEHA must show that (1) the plaintiff was subjected to discrimination; (2) the defendant failed to take all reasonable steps to prevent discrimination; and (3) that failure caused the plaintiff to suffer injury, damage, loss or harm.  *Leland v. City & County of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008).  The employer's duty to prevent harassment and discrimination is affirmative and mandatory.  *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002).  No liability can arise for failing to take necessary steps to prevent discrimination, however, except where discriminatory conduct actually took place and was not prevented.  *Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998) ("We do not believe the statutory language supports recovery on such a private right of action where there has been a specific factual finding that no such discrimination or harassment actually occurred . . . .").  Some examples of "reasonable steps" available to remedy harassment, discrimination, or retaliation under FEHA include "affirmatively raising the subject of harassment, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under California law, and developing methods to sensitize all concerned."  2 Cal. Code Regs. § 11019(b).  Other reasonable steps an employer might take include the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle discrimination-related complaints and grievances.  *Cal. Fair Emp't & Housing Comm'n v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1025 (2004).  The causation element of a section 12940(k) claim requires an employee show that the discriminatory conduct was a "substantial factor" in causing his harm.  CACI No. 2527; *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 480 (2013). Termination from employment is an injury sufficient to support recovery under a section 12940(k) failure-to-prevent-discrimination claim. *See Gemini Aluminum*, 122 Cal. App. 4th at 1025.

Among other evidence that might be relevant to this claim, Fuqua states in her declaration that UPS took no action in response to two notes she submitted raising concerns about how UPS handled issues related to her disability, one of which Mangaoang returned to her and told her to rewrite because it was not the document that Comer had requested.  *See* Fuqua Decl. ¶¶ 29–31 & Exs. J, K.[18]  There is also no indication that UPS took corrective action after Mangaoang purportedly told Fuqua that she must be fully healthy to return to work, even after Mangaoang informed Loretta Calderon in the risk management department that she had "told [Fuqua] that she had to come back without restrictions."  *See* Fuqua Decl. ¶ 38; Mangaoang Decl. ¶ 17 & Ex. E.  A jury could reasonably conclude from that evidence that UPS failed to implement effective policies to prevent discrimination and harassment based on disability.  UPS's motion is therefore DENIED as to Fuqua's failure-to-prevent claim.

### I.    No Genuine Issues Exist Regarding the Labor Code or Punitive Damages

Fuqua's opposition brief does not respond to two arguments of UPS's motion: that Fuqua's Labor Code claim is meritless because any lack of pay for days that she worked was due to her own failure to record her hours, Mot. at 23–24, and that Fuqua cannot recover punitive damages because there is no evidence that an officer, director, or managing agent of UPS acted with the requisite culpability to warrant such damages, *id.* at 24 (citing Cal. Civ. Code § 3294; *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577 (1999)).  Fuqua has not met her burden to identify "particular parts of materials in the record" demonstrating genuine issues of fact as to these claims.  *See* Fed. R. Civ. P. 56(c)(1).  The Court therefore GRANTED UPS's motion as to Fuqua's eighth claim, under the California Labor Code, and as to her prayer for punitive damages.

### IV.   CONCLUSION

For the reasons discussed above, the Court GRANTED UPS's motion as to Fuqua's disparate impact claim, California Labor Code claim, and prayer for punitive damages, but

---

[18] UPS argues that Fuqua cannot base a failure-to-prevent theory on her notes because they "reference Steinberg's note not being honored, which issued had been resolved."  Reply at 14.  Drawing all inferences in favor of Fuqua, however, a jury might reasonably determine that a more thorough response to Fuqua's complaints could have prevented harassment or discrimination later in 2014 when she sought to return to work.

DENIED the motion as to all other claims.

**IT IS SO ORDERED.**

Dated: October 10, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge